# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Brendan DeBoer, a Task Force Officer ("TFO") with the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), and being duly sworn, depose and state the following:

1. This Application and Affidavit sets forth facts and evidence demonstrating that there is probable cause to believe that evidence, fruits, and instrumentalities of the commission of crimes, specifically violations of federal controlled substance laws, firearms laws, and including but not limited to Title 21, United States Code, Sections 846 and 841(a)(1), Conspiracy To Distribute Controlled Substances, and Possession With Intent To Distribute Controlled Substances; Title 18, United States Code, Section 922, Unlawful Acts; Title 18, United States Code, Section 1956(a)(1), Money Laundering, will be found at the target location listed below.

2. This affidavit is intended to show only there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

3. I am submitting this affidavit in support of a search warrant authorizing a search of 316 Barrar Avenue, Knoxville, TN 37920 ("TARGET RESIDENCE").

## Training and Experience

4. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to

1

conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

5. I am currently the Deputy Director 9th Judicial Drug Task Force and employed by the Attorney General's Office of the 9th Judicial District in the State of Tennessee. I am a Federal Task Force Officer (TFO) assigned to Homeland Security Investigations in Knoxville, Tennessee. I have been employed with the 9th Judicial Drug Task Force since 2011 and prior to 2011 I was a Post Certified Police Officer with the City of Loudon Police Department in Loudon, Tennessee. I have been an HSI TFO since September of 2022. I have been in the field of law enforcement for approximately 16 years. My primary duties now involve the investigation of the Tennessee Drug Control Act violations. I have participated in investigations involving small and large-scale narcotics on the state and federal level. I have used overt and covert methods of investigation to include but not limited to undercover operations, search warrants, controlled deliveries, interview/interrogation, controlled purchases, and long-term surveillance operations. I have received specialized training on/in narcotics investigations, drug trafficking, search warrant writing and preparation, surveillance, and criminal investigations. I have participated in, organized, and initiated several investigative efforts that have targeted drug dealers and their criminal organizations on both the federal and state level. The investigations in which I have participated in have resulted in the arrest, prosecution, and conviction of individuals who have smuggled, received, and distributed controlled substances, including marijuana, cocaine, heroin, fentanyl, methamphetamine, MDMA, and prescription pills, to name a few, as well as the seizure of those illegal drugs and proceeds from the sale of those drugs. While conducting criminal investigations, I have conducted lawful searches of residences, businesses, and other areas under the control of individuals who were trafficking or dealing in controlled substances. I have

debriefed and interviewed defendants and informants who have extensive knowledge of drug trafficking, drug dealing/distribution, and criminal organizations. In addition, I have conducted, in connection with these and other cases, follow-up investigations concerning the identification of co-conspirators through the use of drug ledgers, telephone records, bills, receipts, and photographs. The schools/training which I have attended included current trends in narcotics trafficking, use of telephones and internet by drug traffickers, techniques used by drug traffickers to avoid detection by law enforcement, the use of confidential informants, surveillance techniques, and the use of other investigative techniques in narcotics-related investigations. Throughout my career as an investigator and supervisor, I have participated in narcotics investigations including wiretap investigations conducted by the Tennessee Bureau of Investigation (TBI) and HSI.

6. Based on my training and experience, I know that drug trafficking at the retail level is largely a cash business. I know that drug traffickers often generate large amounts of unexplained wealth, and through financial transactions, attempt to conceal, disguise, or legitimize unlawful proceeds through domestic and international banks and their attendant services, securities brokers, professionals, such as attorneys and accountants, casinos, real estate, shell corporations, and business fronts, and otherwise legitimate businesses which generate large quantities of currency. In addition, drug traffickers often use drug proceeds to purchase additional narcotics to perpetuate and promote the ongoing conspiracy. I know that drug traffickers often use cell phones to communicate with co-conspirators in furtherance of their money laundering activities.

7. Based upon my training and experience with narcotics trafficking, money laundering, and criminal investigations, combined with the knowledge and information provided by other law enforcement officers, I know that:

3

a. Drug dealers usually keep controlled substances and paraphernalia for packaging, cutting, weighing, transporting, and distributing controlled substances at places under their control, such as their residences, or in the control of their trusted associates. Drug paraphernalia is typically in close proximity to the locations of the controlled substances themselves.

b. Persons involved in drug distribution and its related money laundering activities acquire and maintain records related to drug distribution and records relating to the acquisition and disposition of drug proceeds. Drug traffickers commonly create and maintain books, records, receipts, notes, ledgers, and documents reflecting the names, nicknames, addresses, telephone and pager, and other contact numbers of their drug trafficking conspirators, including their sources of supply and their customers. These documents and records can be kept on paper or in electronic form on cell phones and/or computers. These records typically document the following:

  i. amounts of money owed and amounts of drugs purchased by customers, as well as amounts of money owed to and amounts of drugs purchased from sources of supply;

  ii. transportation to acquire and to sell drugs;

  iii. the purchase of drugs, drug packaging supplies, drug paraphernalia, and other assets used to facilitate the acquisition and sale of drugs; and

  iv. the location of storage facilities and other stash locations to store drugs.

c. Drug traffickers commonly profit and amass proceeds from their illicit activity. In order to protect their illegal activity and be able to utilize the profits, they attempt to disguise and legitimize these profits through money laundering activities.

d. Drug traffickers often purchase and/or title assets bought with illegal proceeds in fictitious names, aliases, names of relatives, associates, or business entities, who serve as

4

"nominee" title holders while the criminals actually own and continue to use the assets and exercise dominion and control over the assets.

  e. Drug traffickers often engage in legitimate businesses as a "front" to launder drug proceeds. The business front provides a means for the criminal to show that he/she has legitimate income, when, in fact, the income is solely from the criminal activity. Records of such legitimate businesses funded by the proceeds of illegal activity constitute relevant evidence of money laundering offenses.

  f. Drug traffickers maintain records pertaining to their acquisition, conversion, movement, secreting, transfer, concealment and/or expenditure of drug proceeds, such as: currency, financial instruments and investments, real estate, automobiles, boats, other vehicles, other assets in the form of books, records, invoices, receipts, records of real estate transactions, purchase agreements, automobile titles, bank statements, financial statements, letters of credit, money orders, cashier's checks, safe deposit box agreements and keys, and money wrappers.

  g. Drug traffickers and their associates are known to use aliases, fictitious and multiple addresses, as well as maintain records of the same, in order to conceal their true identity and hinder law enforcement investigation of their illegal activity.

  h. Drug traffickers primarily utilize U.S. currency as the method of conducting their illegal activity. Therefore, drug traffickers often maintain, and have quick access to, large amounts of U.S. currency or other liquid assets in order to maintain and finance their ongoing criminal business.

  i. Drug traffickers often utilize electronic equipment such as computers, smartphones, tablet computers, currency counting machines, and telephone answering machines

5

to generate, transfer, count, record, and/or store the information described in the preceding paragraphs.

  j. Drug traffickers often take or cause to be taken photographs or video movies of themselves, their associates, their property and assets, and their product, which are stored on cellphones or other electronic storage devices.

  k. In modern times, a key tool for drug traffickers is the use of cellular phones. Cellular phones are used to communicate and coordinate with customers, sources of supply, and others through calls, voice notes, text messages, and other messaging applications. Drug traffickers commonly keep cell phones on their person or nearby their person in their residences or trap houses (or houses used to sell drugs out of). Moreover, cell phones can now be used to conduct financial transactions, including mobile payment applications, or other financial transactions. Cell phones can contain stored contact lists for sources of supply, customers, and co-conspirators, payment information, bank records, stored communications, stored end-to-end encrypted communications, and other records. Cellphones can also record locations, photographs of cash proceeds and illegal drugs, and other evidence of drug trafficking activity. The above-described information can be stored and saved for long periods of time on cell phones and can be recovered by law enforcement investigative techniques.

  l. Drug traffickers commonly maintain firearms, such as handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons. These weapons are used to protect and secure their property, drugs, and cash stores from thieves, as drug traffickers are often the victims of robberies and "rip-offs" during a drug or other illegal transaction. Because firearms are in demand by drug dealers, such items are often bartered for drugs or other contraband.

Indeed, the law has long recognized that the presence of firearms is relevant and probative of drug crimes, as such are tools of the trade of drug traffickers.

    m.    Drug traffickers are not unlike other individuals in that they maintain historical documents and records such as those documents, records, and other items described above. These documents and records will normally be retained for long periods of time regardless of whether their value to the individual has diminished. These documents, records, and other items described above are often maintained in the places within the criminals' dominion and control, such as their residences, garages, other outbuildings, and appurtenances associated with such residences, and curtilage associated with such residences, automobiles, boats, trailers, and other vehicles.

### Probable Cause

    8.    In Spring 2022, the United States Postal Inspection Service ("USPIS") became aware of suspicious packages being sent through the USPS, from several area Knoxville, TN post offices to Santa Rosa, California and vicinity, a source area for controlled substances. Upon further investigation of the return address information listed on many of the outbound parcels, law enforcement determined the use of fictitious names and/or variations of true names and addresses.

    9.    Through physical surveillance of delivery addresses and as well as the review of video surveillance obtained from the South Station Post Office in Knoxville, Tennessee, law enforcement identified Jose Alfredo LOPEZ Colin ("LOPEZ") as the mailer of multiple parcels suspected to contain contraband such as drug proceeds and/or US currency. LOPEZ was also identified as the mailer on over a dozen other outgoing parcels to target addresses in Santa Rosa, California, and vicinity. On many of these parcels, LOPEZ listed variations of his name as well

7

as fictitious names such as, "Juan Colin", "Juan Perez" and "Rafael Lopez." Further review of video surveillance revealed LOPEZ was operating a black Cadillac sedan.

10. On or about April 4, 2022, law enforcement conducted a traffic stop on the black Cadillac Sedan in Knoxville, TN, after observing it leave the TARGET RESIDENCE. The occupants of the vehicle were identified as Luis PLANCARTE Montejano, Rene CAMACHO, and Jose LOPEZ Colin.

11. A review of PLANCARTE's criminal history revealed he has arrests for firearms offenses, carjacking, marijuana possession, transporting marijuana, money laundering, and manufacture/deliver/sell of controlled substances. In April 2022, law enforcement learned the current account holder for utilities at the TARGET RESIDENCE was PLANCARTE. A query conducted on the State of Tennessee Criminal Justice Portal revealed PLANCARTE's Tennessee driver's license reflected 316 Barrar Avenue, Knoxville, TN as his address.

12. A review of CAMACHO's criminal history revealed he has convictions for theft of property $10,000-$60,000, possession of a handgun – convicted felon (three counts), and Schedule VI drugs. CAMACHO is currently on felony probation with the Tennessee Department of Corrections. Furthermore, CAMACHO has an active Violation of Probation warrant in Sevier County, TN.

13. During this investigation law enforcement has observed vehicles, primarily rental vehicles, driven by CAMACHO at the TARGET RESIDENCE at all hours of the day and night. This surveillance by law enforcements has shown patterns of behavior indicating that the TARGET RESIDENCE is the primary residence of CAMACHO.

8

14. A review of LOPEZ's criminal history revealed he has arrests for illegal entry into the United States. LOPEZ is currently wanted by law enforcement in California for rape.

15. Through further investigation of deliveries inbound to Knoxville, Tennessee from the Santa Rosa, California area, investigators identified five addresses located near one another. Specifically, 1227 Exeter Avenue, 1947 Keith Avenue, 316 Barrar Avenue, 804 Asbury Road, and 304 W. Oldham Avenue have all received parcels on a regular basis from the same area in California.

16. On or about December 8, 2022, a Postal Inspector, posing as a USPS letter carrier conducted a controlled delivery of a Priority mail parcel related to this investigation to 1947 Keith Avenue, Knoxville, TN. The Postal Inspector delivered the parcel to the door located under the carport of the residence after receiving no response from anyone to answer the door. Approximately fifteen minutes after the delivery, law enforcement observed a vehicle occupied by CAMACHO arrive at the residence, take possession of the package from the carport, and drove away from the residence. Law enforcement followed the same vehicle occupied by CAMACHO and another unknown male to the TARGET RESIDENCE.

17. On December 19, 2022, Inspectors from USPIS identified an incoming parcel from Clearlake, California that was destined for delivery to 316 Barrar Avenue, Knoxville, Tennessee. Inspectors took possession of that parcel and on December 20, 2022, were granted a federal search warrant by the Honorable United States Magistrate Judge Debra C. Poplin in the Eastern District of Tennessee (3:22-MJ-1247) to open and seize any illegal contraband located in the parcel. The parcel contained approximately two (2) pounds of marijuana.

9

18. Delivery address 173 Siesta Way, Sonoma, California 95476, has received approximately twenty-seven (27) packages from Knoxville, Tennessee over the last year. On at least eight (8) of those parcels, LOPEZ has been identified as the mailer. The parcel weights typically averaged less than a pound with several averaging three and four pounds.

19. On January 4, 2023, law enforcement identified an incoming parcel from Santa Rosa, California destined for delivery at 1227 Exeter Avenue, Knoxville, Tennessee. Law enforcement conducted surveillance of the delivery of the subject parcel to the residence. The parcel was placed on the front porch by the USPS letter carrier. Approximately thirty (30) minutes following the delivery, CAMACHO arrived at the residence in a white Dodge Charger. CAMACHO retrieved the subject parcel from the front porch of the residence and immediately returned to his vehicle and drove away from the residence. The white Dodge Charger was determined to be a rental vehicle with 316 Barrar Avenue, Knoxville, Tennessee listed as the address for the renter.

20. In January 2023, Inspectors obtained information from a postal service database that a large Priority mail parcel was mailed from Knoxville, Tennessee destined for Santa Rosa, California. Law enforcement reviewed the surveillance video from the Post Office where the package was sent from and found that the sender of the parcel was CAMACHO, who is believed to reside at the TARGET RESIDENCE. This parcel was seized by law enforcement.

21. On January 20, 2023, the Honorable United States Magistrate Judge Debra C. Poplin granted a search warrant for the large Priority mail parcel. A search of this parcel was revealed to contain four firearms, one of which was reported stolen.

22. On or about February 2, 2023, Postal Inspectors identified a suspected contraband parcel while reviewing outbound Priority Mail Express parcels at the Knoxville Processing and Distribution Center. Inspectors recognized the sender and recipient addresses listed on the mailing label. The sender's information on the mailing label depicted "Jose Lopez, 316 Barrar Ave, Knoxville, TN 37920" and the destination address on the label depicted "Julio Lopez, 173 Siesta Way, Sonoma, CA 95476." Law enforcement sought and obtained a "sneak and peek" federal search warrant for this parcel, which was granted by the Honorable United States Magistrate Judge Jill McCook on February 6, 2023. This package was found to contain approximately $5,800 in US currency.

23. On or about February 23, 2023, law enforcement conducted a controlled delivery of a 14-pound USPS parcel to 1227 Exeter Avenue, Knoxville, TN. This parcel shipped from Santa Rosa, CA. This address has received numerous packages, believed to contain controlled substances, from California. Approximately one hour after the parcel was delivered, a white SUV arrived in front of the residence. A Hispanic male, believed to be CAMACHO, was observed exiting the white SUV and then loading the parcel into the backseat of the white SUV. Upon departing from Exeter Avenue, the white SUV traveled to I-275 south and continued on I-40 east. The vehicle exited the interstate at Cherry Street and ultimately returned to I-40 and began traveling west on the interstate. Surveillance agents believed the driver of the white SUV was attempting to detect the presence of covert law enforcement tracking before traveling to his intended destination by making turns or maneuvers that were inconsistent with normal methods of travel. Surveillance agents continued to follow the white SUV and noted the vehicle was taking an indirect route to the suspected destination, 316 Barrar Avenue. Eventually, the vehicle arrived at the TARGET RESIDENCE.

24. On March 2, 2023, Inspectors, utilizing postal service databases, identified a suspected contraband parcel. This parcel listed "Jose Lopez" at "316 Barrar Avenue, Knoxville, Tennessee 37920" as the sender. Inspectors took possession of the parcel and noticed several factors on the parcel that stood out. The sender and recipient address as well as the handwriting on the mailing label appeared the same as identified previously on other such parcels in this investigation.

25. On or about March 8, 2023, Inspectors were granted a federal search warrant in reference to this parcel by the Honorable United States Magistrate Judge Jill McCook. This parcel was found to contain $7220 dollars in US Currency. This currency was taped inside a folded USPS flat rate box which was then placed inside a USPS Flat Rate envelope. This method of concealment was identical to the method use on the box that was intercepted on February 2nd, 2023.

## Conclusion

26. Based on the foregoing, I request the Court issue the proposed search warrant.

Respectfully submitted,

_____
Brendan DeBoer
Task Force Officer, HSI

Subscribed and sworn to before me on March 28th, 2023.

_____
DEBRA C. POPLIN
UNITED STATES MAGISTRATE JUDGE

12

## ATTACHMENT A

### Property to Be Searched

This warrant applies to the residence, the curtilage thereof, and any vehicles located on the property, located at 316 Barrar Ave, Knoxville, TN 37920 ("TARGET RESIDENCE"). This property is described as follows:

Description: A large single-family multi-story dwelling, with a large parking area in front of the residence, 316 Barrar Ave, Knoxville, TN 37920, as depicted in the photograph below.



13

# ATTACHMENT B

## Particular Things to be Seized

All items in the TARGET RESIDENCE which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use, or which is or has been used as the means of committing violations of Title 21, United States Code, Sections 846, 841; Title 18, United States Code, Section 922, Unlawful Acts; Title 18, United States Code, Section 1956(a)(1), Money Laundering, including but not limited to:

a. Any controlled substances, packaging material, scales, and items used to weigh, package, measure, and distribute controlled substances;

b. Drug paraphernalia; drug records, drug ledgers, account books, notes, names or code names and nicknames, or identifying information reflecting customers, amounts of drugs bought and sold, and amounts of money paid, owed, or collected;

c. United States Currency reflecting proceeds of drug sales or monies set aside for the purchase of drugs; financial instruments; safes, lock boxes, lockable money bags, and other containers which can be used to secure and conceal drugs, currency, firearms, proceeds of drug transactions, or records of drug transactions;

d. Financial records reflecting illicitly obtained monies and/or other forms of assets acquired through the sales, trafficking, or distribution of controlled substances which include federal and state tax returns, employment papers, banking records and pass books, account information, canceled checks, deposit records, income and expenditures records, property acquisition records, money market accounts and/or similar accounts,

14

records of stocks and/or bonds purchased or exchanged; credit card records, records reflecting the rental of safe deposit boxes; safe deposit box keys; records reflecting vehicles owned, purchased, sold or leased; and negotiable instruments, and any and all items commonly traded for controlled substances consisting in part of, and including jewelry, precious stones and metals, televisions and electronic equipment;

e. Cellular telephones or personal computers, containing electronic versions of the above-described records, photographs, or videos; records reflecting the identities, addresses, and telephone numbers of customers who use, transport, or distribute controlled substances, containing communications by members of the drug trafficking organization about drug sales, purchases, cash proceeds, bank records, financial transactions, location information or other evidence of violations of 21 U.S.C. §§ 846, 841, 18 U.S.C. § 922, and 18 U.S.C. § 1956.

f. Firearms, ammunition or other weapons used to protect drugs or proceeds of illegal drug sales, or purchased with proceeds from illegal drug sales;

g. Papers, passports visas or other travel documents, identification cards or papers, driver's licenses, tickets, notes, receipts, and other items relating to travel expenditures; computers, electronic storage devices, physical keys, encryption devices, dongles, and similar physical items necessary to gain access to computer equipment, electronic storage devices, or data;

h. Indicia of ownership of the property being searched, or contents thereof.